UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PLYMOUTH YONGLE TAPE | ) | |
| (SHANGHAI) CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 08-11599-JGD |
| PLYMOUTH RUBBER COMPANY, LLC | ) | |
| and PLYMOUTH RUBBER CO., INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION AND ORDER
ON PLYMOUTH RUBBER COMPANY, LLC'S
MOTION TO COMPEL ARBITRATION**

October 22, 2010

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Plymouth Yongle Tape (Shanghai) Co., Ltd. ("Yongle"),

commenced this action against Plymouth Rubber Co., Inc. and its successor, Plymouth

Rubber Co., LLC (collectively, "Plymouth Rubber"), to recover amounts due for goods

sold and delivered.  Plymouth Rubber responded to the plaintiff's claims by denying

liability and asserting various Counterclaims, including but not limited to claims that

Yongle breached three different contractual agreements, tortiously interfered with certain

of Plymouth Rubber's business and contractual relationships, and misappropriated

Plymouth Rubber's proprietary information.  Litigation of Plymouth Rubber's

Counterclaims against Yongle has been stayed pending submission of those claims to the

Hong Kong International Arbitration Centre ("HKIAC") for arbitration pursuant to the Rules of Arbitration of the HKIAC.   However, Yongle's claims remain pending before this court.

The matter is presently before the court on "Plymouth Rubber Company LLC's Motion to Compel Arbitration" (Docket No. 55).  By its motion, Plymouth Rubber is seeking an order compelling the submission of Yongle's claims to the HKIAC so that all of the claims and Counterclaims asserted in this action will be resolved by arbitration in a single forum.  As detailed herein, Plymouth Rubber has not shown that the parties entered into an agreement to arbitrate the claims at issue or that arbitration is otherwise appropriate.  Therefore, and for all the reasons set forth below, the defendant's motion is DENIED.

## II.  BACKGROUND

The following briefly describes the factual and procedural background that is relevant to the defendant's pending motion to compel arbitration.  A more comprehensive description of the parties' dispute can be found in this court's December 29, 2009 Memorandum of Decision and Order ("Order") (Docket No. 52) on Yongle's and Delphi Automotive Systems, LLC's motions to dismiss.

Yongle initiated this action by filing a Complaint against Plymouth Rubber on September 18, 2008.  (Compl. (Docket No. 1)).  On October 8, 2008, Yongle filed an Amended Complaint.  (Am. Compl. (Docket No. 11)).  Therein, Yongle claims that Plymouth Rubber failed to comply with the terms of a 2005 Consignment Agreement

between the parties, which provides for the shipment of goods from the plaintiff to the defendant on a consignment basis and for the payment of the goods by the defendant. (See id. ¶¶ 11-26).  In particular, Yongle alleges that Plymouth Rubber has failed to pay over $5 million in amounts due for shipments of goods under the Consignment Agreement.  (Id. ¶¶ 18-24).  It also alleges that the defendant has failed to satisfy its contractual obligations by refusing to account for the inventory of goods remaining in its possession, refusing Yongle's request to inspect its inventory, and failing to return the goods for which it has not paid.  (Id. ¶¶ 14, 16, 25-26).

The Amended Complaint contains six separate claims for relief, which are based on the parties' rights and obligations under the Consignment Agreement and arise out of Plymouth Rubber's alleged failure to pay for, return, account for or permit inspection of the goods.  (See id. ¶¶ 27-45).  Neither Yongle's factual allegations nor its claims for relief contain any references to any agreements other than the Consignment Agreement or describe any business relationship between the parties other than the one established by the terms of the Consignment Agreement.

On November 25, 2008, Plymouth Rubber filed an Amended Answer and Counterclaim to Amended Complaint in which it denied liability for Yongle's claims and asserted Counterclaims against Yongle and a third party, Delphi Automotive Systems, LLC ("Delphi").  (Docket No. 15).  The substance of Plymouth Rubber's Counterclaims is described in this court's December 29, 2009 Order.  In its Amended Answer ("Answer"), Plymouth Rubber alleges, as it does here, that the Consignment Agreement

was "an ancillary subsidiary agreement" that it entered into with Yongle "subject to and

in connection with" a "comprehensive business deal" between the parties.  (Answer ¶ 11).

Pursuant to that deal, Plymouth Rubber allegedly

> closed its United States manufacturing facility, and contributed certain of
> its intellectual property for, among other things, rubber-based adhesives,
> primers, PVC films, formulations, vendors, technical standards, inspection
> methods to [Yongle] in exchange for the exclusive right in the Western
> Hemisphere to purchase and sell the proprietary products manufactured by
> [Yongle] in China using and incorporating Plymouth's intellectual property.

(Id. ¶ 10).

According to Plymouth Rubber, the parties' "comprehensive business deal" is

reflected in several agreements that were executed on December 22, 2004, including an

Equity Investment and Transfer Agreement (the "Equity Agreement"), a Technology

Transfer Agreement (the "Technology Agreement") and a Sales and Distribution

Agreement (the "Sales Agreement") (collectively, the "December 22 Agreements").  (Id.).

Each of those agreements contains a dispute resolution provision which provides for the

submission to arbitration of disputes arising in connection with the agreement.[1]  (See

Order at 30-32).  However, the Consignment Agreement contains no dispute resolution

---

[1]  Both the Equity Agreement and the Technology Agreement provide for the submission
to arbitration of "[a]ny dispute arising out of or in connection with this Agreement, including any
questions regarding its existence, validity or termination[.]" (Equity Agreement (Docket No. 18-
29) at Article 86; see also Technology Agreement (Docket No. 18-32) at Article 8 (incorporating
the terms of the Equity Agreement's arbitration provision into the Technology Agreement and
making them applicable to the Technology Agreement)).  Similarly, the Sales Agreement provides
in relevant part for the submission to arbitration of "[a]ny disputes arising from the
implementation of, or in connection with, this Agreement[.]" (Sales Agreement (Docket No. 18-
33) at Section 9.2).

provision and does not provide for the arbitration of disputes arising out of or in connection with the Consignment Agreement.  (See Consignment Agreement (Docket No. 18-3)).

Both Yongle and Delphi filed motions to dismiss Plymouth Rubber's amended Counterclaims.  (See Docket Nos. 17 and 24).  Additionally, Yongle moved, in the alternative, to stay litigation of the Counterclaims and compel arbitration of those claims. (See Docket No. 17).  In connection with its motion, Yongle submitted a Declaration from its counsel, Stephen C. Bennett.  (See Reply Bennett Declaration in Support of Plaintiff's Motion to Dismiss Amended Counterclaims ("Reply Bennett Decl.") (Docket No. 34)).  Therein, Attorney Bennett informed the court that prior to the commencement of the litigation, Yongle had sent a letter to Plymouth Rubber in which it had offered to arbitrate "all disputed matters."  (Id. ¶ 5).  However, Plymouth Rubber did not respond to the offer, and Yongle filed its initial complaint in this action.  (Id.).  Attorney Bennett also represented to the court that "Yongle remains open to arbitration of all matters between the parties, including issues arising out of the Consignment Agreement.  I have made that position clear in discussions with Plymouth's counsel regarding potential resolution of this matter."  (Id. ¶ 6).  However, according to the plaintiff, even after the litigation was filed, Plymouth Rubber remained unwilling to accept Yongle's proposal to arbitrate all of the parties' claims, and remained steadfast in its assertion that its Counterclaims were not arbitrable.  (Bennett Declaration in Support of Yongle's Opposition to Plymouth Rubber's Motion to Compel Arbitration ("Bennett Decl.")

5

(Docket No. 58) ¶¶ 6-7).

On December 29, 2009, this court allowed Delphi's motion to dismiss, denied Yongle's motion to dismiss without prejudice and allowed Yongle's motion to stay litigation and compel arbitration of Plymouth Rubber's Counterclaims.  (Order (Docket No. 52) at 2, 36-37).  As set forth in its Order, this court determined that arbitration of the Counterclaims was warranted under the arbitration provisions set forth in the Equity, Technology and Sales Agreements.  (Id. at 31-35).  It also concluded that Yongle did not waive its right to claim arbitration by filing suit and participating in some discovery in this action since Yongle's claims were brought under the Consignment Agreement, which did not contain an arbitration provision.  (Id. at 36).  Moreover, the Court noted that Yongle had consistently argued that the Counterclaims were governed by arbitration clauses.  (Id.).  Finally, this court stated in relevant part as follows:

> As detailed above, Plymouth Rubber's counterclaims are permissive.  Thus, unlike Gutor Int'l AG v. Raymond Packer Co., Inc., 493 F.2d 938 (1st Cir. 1974), on which Plymouth Rubber relies, Yongle's claims are not so intertwined with the arbitrable claims that it would be "unconscionable" to allow Yongle's claims to go forward in court, while Plymouth Rubber's claims go forward in arbitration.  Id. at 945.  In any event, Yongle has agreed to submit its claims to arbitration if Plymouth Rubber's claims are found arbitrable.  See Reply Bennett Decl. at ¶ 6.

(Id.) (emphasis added).  The consequences of  Yongle's assertion that it was prepared to submit its claims under the Consignment Agreement to arbitration are discussed below.

Additional factual details relevant to this court's analysis are described below where appropriate.

## III.  ANALYSIS

### A.      Judicial Estoppel

Plymouth Rubber argues as an initial matter that Yongle should be judicially estopped from arguing against arbitration of its claims because Yongle's current position contradicts its prior representations on which the court relied, and by changing its position on arbitration, Yongle seeks to secure an unfair advantage over Plymouth Rubber in this action.  This court finds that application of the doctrine of judicial estoppel is not appropriate in this case.

### Judicial Estoppel – Generally

"'As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding.'" Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 32-33 (1st Cir. 2004) (quoting InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003)).  The primary purpose of the doctrine "is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system." Id. at 33.  "Consequently, the 'guiding principle of judicial estoppel' is that it should apply 'when a litigant is playing fast and loose with the courts, and when intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" GE HFS Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 520 F. Supp. 2d 213, 223 (D. Mass. 2007) (quoting Patriot Cinemas, Inc. v. Gen. Cinemas Corp., 834 F.2d

208, 212 (1ˢᵗ Cir. 1987)) (internal quotations omitted).

While "[t]he contours of the doctrine are hazy, and there is no mechanical test for determining its applicability[,]" the First Circuit has determined that, "at a minimum, two conditions must be satisfied before judicial estoppel can attach.  First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive.  Second, the responsible party must have succeeded in persuading a court to accept its prior position."  Alternative Sys. Concepts, Inc., 374 F.3d at 33 (internal citations omitted).  Additionally, "[w]hile it is not a formal element of a claim of judicial estoppel, courts frequently consider a third factor: absent an estoppel, would the party asserting the inconsistent position derive an unfair advantage?  Relatedly, courts often inquire as to whether judicial acceptance of a party's initial position conferred a benefit on that party."  Id.  Accordingly, "in a prototypical case, judicial estoppel applies when 'a party has adopted one position, secured a favorable decision, and then taken a contradictory position in search of legal advantage.'"  Id. (quoting InterGen N.V., 344 F.3d at 144).

### Application to the Present Case

The circumstances presented in the instant case do not satisfy the conditions necessary to support the application of judicial estoppel.  As an initial matter, Yongle never indicated that it was legally bound to submit its claims to arbitration; rather, its

offer was one of convenience.[2]  See Brewer v. Madigan, 945 F.2d 449, 455 (1st Cir. 1991)

("The judicial estoppel doctrine protects the integrity of the judicial process by preventing

a party from taking a position inconsistent with one successfully and unequivocally

asserted by that same party in a prior proceeding").  Thus, Yongle's current position– that

its claims under the Consignment Agreement are not arbitrable–  is not "directly

inconsistent" with its earlier representations to the court.  Alternative Sys. Concepts, Inc.,

374 F.3d at 33.

In addition, this court's decision on Yongle's motion to stay litigation and compel

arbitration of Plymouth Rubber's Counterclaims was not based on Yongle's

representations about its willingness to arbitrate its claims.  As detailed in the December

29, 2009 Order, this court concluded that arbitration of the Counterclaims was warranted

pursuant to the dispute resolution provisions contained in each of the December 22

Agreements.  (Order at 31-35).  It also determined that Yongle had not waived its right to

claim arbitration by its conduct in filing this action and participating in limited discovery.

(Id. at 36).  Although this court noted what it understood to be Yongle's willingness to

submit its claims to arbitration in the event it prevailed on its motion, this court's

conclusions about the arbitrability of the defendant's Counterclaims, and the outcome of

---

[2]  Yongle argues that it may not be bound by its prior offers to arbitrate all disputes in connection with its effort to achieve a settlement because Plymouth Rubber did not accept, and effectively rejected, its offer.  (Pl. Mem. (Docket No. 57) at 5-8).  However, Plymouth Rubber does not argue that Yongle's offers gave rise to an agreement to arbitrate Yongle's claims. Instead it argues that Yongle has made inconsistent representations to the court in order to secure an unfair advantage.  Therefore, it is unnecessary to further consider Yongle's argument.

the motion, were not dependent upon Yongle's representations.  (See id. at 31-37).
Therefore, Yongle did not secure a favorable position by expressing some willingness to
arbitrate its claims.

Finally, nothing in the record before this court suggests that Yongle will derive an
unfair advantage as a result of its decision to oppose Plymouth Rubber's motion to
compel arbitration.  Plymouth Rubber argues that "Yongle has secured an unfair
advantage by having misled the Court into removing Plymouth Rubber's Counterclaims
from this litigation on the pretense that Yongle was also willing to submit its claims to
arbitration."  (Def. Mem. (Docket No. 56) at 9-10).  However, because this court's
decision to send the Counterclaims to arbitration was not based on Yongle's earlier
representations, Yongle did not mislead the court into removing those claims from the
litigation.  Furthermore, there is no reason to believe that Yongle will obtain a more
favorable outcome on its claims, or that Plymouth Rubber will obtain a less favorable
outcome on its Counterclaims, simply because those claims will be resolved in different
forums.  Therefore, the record does not support the conclusion that Yongle has played
"fast and loose" with the court or that it should be estopped from opposing the pending
motion.[3]

_____

[3] Yongle argues that it is Plymouth Rubber which has attempted to "play fast and loose"
with the court by arguing against arbitration in its opposition to Yongle's motion to dismiss and
taking an inconsistent position in its present motion.  (Pl. Mem. at 2-3).  This court disagrees.  In
its opposition to Yongle's motion to dismiss, Plymouth Rubber was addressing the arbitrability of
its Counterclaims, not the arbitrability of Yongle's consignment claims.  Thus, its current position,
that Yongle's claims should be submitted to arbitration, is not inconsistent with its prior

B.      **Arbitrability of Yongle's Claims**

It is undisputed that the Consignment Agreement contains no arbitration provision.

Nevertheless, Plymouth Rubber argues that Yongle's claims should be subject to the

arbitration provisions contained in the December 22 Agreements because those claims

and the Consignment Agreement flow from those Agreements and the comprehensive

business relationship established by them.  This court disagrees for the reasons that

follow.

**Standard of Review**

Section 3 of the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), provides

as follows:

> If any suit or proceeding be brought in any of the courts of the United
> States upon any issue referable to arbitration under an agreement in writing
> for such arbitration, the court in which such suit is pending, upon being
> satisfied that the issue involved in such suit or proceeding is referable to
> arbitration under such an agreement, shall on application of one of the
> parties stay the trial of the action until such arbitration has been had in
> accordance with the terms of the agreement, providing the applicant for the
> stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  Thus, "[w]hen deciding a motion to compel arbitration, a court must

determine whether '(i) there exists a written agreement to arbitrate, (ii) the dispute falls

within the scope of that arbitration agreement, and (iii) the party seeking an arbitral forum

has not waived its right to arbitration.'" Combined Energies v. CCI, Inc., 514 F.3d 168,

171 (1st Cir. 2008) (quoting Bangor Hydro-Electric Co. v. New England Tel. & Tel. Co.,

representations to the court.

62 F. Supp. 2d 152, 155 (D. Me. 1999)).  "Only if all three prongs of the test are satisfied

will a motion to compel arbitration be granted."  Id.  In the instant case, Yongle does not

contend that Plymouth Rubber waived any right to seek arbitration of the plaintiff's

claims.  The question at issue is whether Yongle's claims fall within the scope of an

arbitration agreement between the plaintiff and the defendant.

      "Although there is a strong federal policy favoring arbitration, that presumption of

arbitrability 'presumes proof of a preexisting agreement to arbitrate disputes . . . .'"

Bowlby v. Carter Mfg. Corp., 138 F. Supp. 2d 182, 187 (D. Mass. 2001) (quoting

McCarthy v. Azure, 22 F.3d 351, 355 (1ˢᵗ Cir. 1994)) (internal citation omitted).

Accordingly, "a party cannot be required to submit to arbitration any dispute which he

has not agreed so to submit."  Id. (quotations, alteration and citations omitted).  This

court finds that Yongle's claims arise out of the Consignment Agreement and not out of

the December 22 Agreements.  Therefore, they are not subject to the arbitration

provisions contained in the December 22 Agreements.

### Yongle's Consignment Claims

      In its Amended Complaint, Yongle's claims for relief are all based on factual

allegations relating to the parties' conduct in connection with the Consignment

Agreement only.  (See Order at 12-14.).  Despite Plymouth Rubber's contention that

Yongle's claims arise out of the parties' overall business relationship, and that "[t]he

scope of Plymouth's alleged fiduciary duty as an 'insider and advisor' are set forth in,

and require construction of the December 22 Agreements," (Def. Mem. at 3, 10), as

detailed in this Court's previous order, this argument "overstates Yongle's claims."

(Order at 13.)  Rather, any alleged breach of fiduciary duty relates to "Plymouth Rubber's

obligations in connection with the goods which were delivered by Yongle but were not

paid for.  There are no factual allegations which would support a broader reading." (Id. at

14).  Therefore, all of Yongle's claims arise out of and are based on Plymouth Rubber's

alleged obligations under the Consignment Agreement and not on the terms of the parties'

December 22 Agreements.

In addition to having no arbitration provision, the Consignment Agreement does

not contain any references to the December 22 Agreements and does not purport to

incorporate any of the arbitration provisions contained in those Agreements.  The fact that

it was entered into between parties who had a preexisting business relationship does not,

without more, establish that the parties had an agreement to arbitrate disputes arising

under the Consignment Agreement.  See Fit Tech, Inc. v. Bally Total Fitness Holding

Corp., 374 F.3d 1, 9-10 (1st Cir. 2004) (declining to apply arbitration clause in one

agreement to dispute arising out of another, related agreement even though both

agreements arose out of parties' business relationship and earlier agreement called for

formation of later agreement).

Plymouth Rubber argues that even if Yongle's claims are based on the

Consignment Agreement, they are subject to the arbitration provisions set forth in the

December 22 Agreements because the Consignment Agreement "flows from" and is "part

and parcel of those Agreements[.]"[4] (Def. Mem. at 11).  However, the defendant has not

pointed to language in any of the Agreements to support its position, and nothing in the

record warrants such a conclusion.  As described above, the Consignment Agreement

contains no references to any of the parties' earlier agreements or to any business

relationship beyond that established under the Consignment Agreement.  Similarly, none

of the December 22 Agreements references the Consignment Agreement.  Moreover, the

record shows that the Consignment Agreement is sufficiently separate and distinct from

the December 22 Agreements to warrant the denial of Plymouth Rubber's motion.

### The December 22 Agreements

The record shows that Yongle was created as a result of the Equity Agreement.

(See generally Equity Agreement (Docket No. 18-29)).  The parties to that Agreement

included Plymouth Rubber and Awesome Products Limited ("Awesome").  (Id.).  Under

the Equity Agreement, Plymouth Rubber agreed to invest in Yongle by contributing

technical information and know-how pursuant to the Technology Agreement among

Plymouth Rubber, Yongle and Awesome.[5]  (See id. at Article 6; Technology Agreement

(Docket No. 18-32)).  Plymouth Rubber also agreed to assist Yongle in marketing its

---

[4]  Plymouth Rubber does not contend that arbitration is warranted based on the breadth of
the language contained in the arbitration provisions of the December 22 Agreements.  Rather, it
argues that the Consignment Agreement is so closely connected to the December 22 Agreements
and the business relationship established thereby that any disputes arising under the Consignment
Agreement should be subject to arbitration.

[5]  The Technology Agreement contains no provisions concerning the purchase and sale of
products. (See Technology Agreement (Docket No. 18-32)).

products, obtaining product qualification approvals and recruiting management personnel, and "[t]o handle other work and matters [that Yongle] may entrust it to do." (Equity Agreement (Docket No. 18-29) at Articles 8 and 23). Additionally, Plymouth Rubber agreed to purchase, and to procure the purchase of, a guaranteed minimum amount of PVC tape products from Yongle. (Id. at Article 11). The Equity Agreement provides that the parties would enter into a separate Sales and Distribution Agreement in order to implement Plymouth Rubber's minimum purchase obligations and "to regulate the sale and purchase of the products of [Yongle.]" (Id. at Article 13).

Both the Technology and Sales Agreements were attached as Appendixes to the Equity Agreement and were deemed to be "inseparable components of" the Equity Agreement. (See id. at Article 91 and Appendixes A and B). The Consignment Agreement, which was entered into in March 2005, three months after execution of the December 22 Agreements, was not attached to or made a component of the Equity Agreement.

Although the stated purpose of the Sales Agreement was to regulate the sale and purchase of products among the parties thereto, the scope of that Agreement with respect to the actual purchase and sale of products is limited. Thus, the Sales Agreement defines the geographical regions and markets in which Yongle, Plymouth Rubber and a third party, Hebei Huaxia Enterprise Co., Ltd. ("Huaxia"), may sell PVC tape products. (Sales Agreement (Docket No. 18-33) §§ 3.1-3.7). It also requires Plymouth Rubber to pay for any products "within 60 days of the shipment of such Products . . . ." (Id. § 3.8).

However, specific provisions regarding payments for products are not included in the Sales Agreement.  Instead, such details were to be provided in a separate "Sales and Payment Agreement" among the parties to the Sales Agreement.  (Id.).  Those parties included Huaxia and Awesome, as well as Yongle and Plymouth Rubber.  (See id. § 1.12).

The Sales Agreement also contains a pricing formula pursuant to which Plymouth Rubber was authorized to purchase up to 100% of its product requirements at a price equal to "material cost plus 50%" or, in certain circumstances, "no less than a price equal to material costs plus 40%."  (Sales Agreement (Docket No. 18-33) § 4.2).  However, nothing in that Agreement, or in either of the other December 22 Agreements, addressed the manner in which Plymouth Rubber's purchases of PVC tape products from Yongle were to be carried out on a day-to-day basis or the terms and conditions of any such arrangement.  In particular, nothing in those Agreements contemplated a consignment arrangement between Yongle and Plymouth Rubber or indicated that any future agreements between those two parties would be incorporated into or made part of any of the contractual arrangements among Awesome, Huaxia, Plymouth Rubber and Yongle.  Thus, the record does not show that the Consignment Agreement was "part and parcel" of the December 22 Agreements or that it was intended to be made "subject to" the "comprehensive business deal" among the parties to the December 22 Agreements.

Plymouth Rubber's reliance on Consumer Concepts, Inc. v. Mego Corp., 458 F. Supp. 543 (S.D.N.Y. 1978), does not compel a different conclusion.  In that case, the

16

parties had entered into a business relationship that was formalized by an "umbrella"

agreement that contained an arbitration provision.  <u>Consumer Concepts, Inc.</u>, 458 F.

Supp. at 543-44.  The parties also had agreed that all future agreements between the

parties would be incorporated into the umbrella agreement as "Items" and attached to the

umbrella agreement under "Schedule 'A.'"  <u>Id.</u> at 543.  At issue was whether a dispute

arising out of a working agreement governing negotiations that never resulted in an

"Item" was covered by the arbitration provision of the umbrella agreement.  <u>See</u> <u>id.</u> at

544-45.  The evidence showed that if the negotiations had been successful, they would

have led to the incorporation of an Item under the umbrella agreement.  <u>See</u> <u>id.</u> at 545.  It

also showed that the working agreement was intended to protect the plaintiff in the event

the negotiations were not fruitful, and that it supplemented the protection provided by the

umbrella agreement.  <u>Id.</u>  The court found that under the circumstances presented, the

working agreement was "a mere extension" of the umbrella agreement, and was therefore

subject to the arbitration clause set forth in the umbrella agreement.  <u>Id.</u>

The circumstances of the instant case differ from the facts presented in <u>Consumer</u>

<u>Concepts</u>.  As detailed above, the December 22 Agreements do not profess to cover all

future aspects of the relationship between Yongle and Plymouth Rubber with respect to

the purchase and sale of products, and do not purport to govern the day-to-day supply of

products.  Furthermore, none of the December 22 Agreements contains language

suggesting that those contracts constitute "umbrella" agreements and that future

agreements are intended to be mere extensions of those Agreements.  Although the

17

Consignment Agreement would not have arisen if the parties had not established a

general business relationship for the manufacture and sale of PVC products, this is not

sufficient to impose an arbitration requirement upon a dispute arising out of a separate

and distinct contract for the provision of goods on a consignment basis.

### The Memoranda of Understanding

Plymouth Rubber also argues that the payment terms set forth in the Consignment

Agreement were revised by three Memoranda of Understanding (the "MOUs") that were

entered into between the parties in 2006 and 2007, and that "[a]ny of Yongle's claims

that arise from these revised agreements and terms also flow from the business

relationship and deal formed by the December 22 Agreements."  (Def. Mem. at 11-12).

Again, nothing in the relevant documents supports Plymouth Rubber's position.

With respect to payment, the Consignment Agreement provides in relevant part as

follows:

> [Plymouth Rubber] will pay [Yongle] weekly (i) for any and all sales of
> [Yongle's] shipped goods that were consummated by [Plymouth Rubber]
> during the previous week or (ii) upon the expiration of sixty (60) days from
> the date on which [Yongle's] shipped goods departed by ship from the port
> in China bound for [Plymouth Rubber], whichever takes place earlier.

(Consignment Agreement (Docket No. 18-3) ¶ 6).  Pursuant to the MOUs, the parties

agreed to amend these terms with respect to invoices from Yongle to Plymouth Rubber

dated October 1, 2006 through March 31, 2008.  Specifically, the MOUs provide in

relevant part that Yongle and Plymouth Rubber "are parties to a Consignment Agreement

executed as of March 2005," and that they "desire to temporarily employ open account

18

payment terms in preference to the terms specified in the said Consignment Agreement[.]" (Def. Mem. at Ex. A).  Accordingly, pursuant to the MOUs, the parties agreed that "[Plymouth Rubber] will pay  [Yongle] for invoices for all goods purchased by wire transfer initiated by instructions to [Plymouth Rubber's] Bank ('Payment') on the 56th day after the date on which [Yongle's] shipped goods departed from the port in China bound for [Plymouth Rubber]," unless the payment date fell on a weekend or holiday, in which case Plymouth Rubber would have additional time to complete its wire transfer. (Id.).  They also agreed that after the expiration of the time period covered by the MOUs, "terms will revert to those specified under the Consignment Agreement" or "as amended by mutual consent of the Parties."  (Id.).

The MOUs do nothing to buttress Plymouth Rubber's argument in favor of arbitration.  The documents contain no references to the December 22 Agreements or to any business relationship between the parties other than the one reflected in the Consignment Agreement.  If anything, they provide further evidence that the Consignment Agreement is sufficiently separate from and independent of the parties' earlier contractual arrangements that the parties' dispute thereunder should not be subject to arbitration.

## C.   Concerns of Fairness and Efficiency

Finally, Plymouth Rubber argues that because "Yongle and Plymouth Rubber's claims flow from the same comprehensive business relationship and agreements," it would be unfair and a waste of resources to require the parties' claims to be heard in

different forums.  (Def. Mem. at 13).  However, this court is not at liberty to compel

arbitration of claims that Yongle did not agree to submit to arbitration.  See Bowlby v.

Carter Mfg. Corp., 138 F. Supp. 2d at 187 ("[A] party cannot be required to submit to

arbitration any dispute which he has not agreed so to submit") (quotations and citations

omitted).  "If the parties had intended the arbitration clause to apply to their

[Consignment Agreement,] . . . it would have been easy to state that expressly."

Combined Energies, 514 F.3d at 174.  There is nothing unfair about holding Plymouth

Rubber to its agreement.

Furthermore, to the extent there may be some overlap between Plymouth Rubber's

defenses to Yongle's claims in this action and its Counterclaims in the arbitration, it will

not be significant.  As this court concluded in its prior Order and as further illustrated

above,  "Yongle's claims are not so intertwined with the arbitrable claims that it would be

unconscionable to allow Yongle's claims to go forward in court, while Plymouth

Rubber's claims go forward in arbitration."  (Order at 36) (quotations and citation

omitted).  Accordingly, Plymouth Rubber's claims of unfairness and inefficiency do not

alter this court's conclusion that its motion to compel arbitration should be denied.

## IV.  CONCLUSION

For all the reasons detailed herein, "Plymouth Rubber Company LLC's Motion to

Compel Arbitration" (Docket No. 55) is DENIED.

                                          / s / Judith Gail Dein
                                         Judith Gail Dein

20

U.S. Magistrate Judge